Thank you. May it please the Court, my name is Tom Nooter and I'm representing the appellant here. This case, this appeal raises two issues in connection with the search of my client's living space within a shared apartment. The first issue is the fact that the roommate of my client gave consent, signed a consent form to have the apartment searched when he was clearly intoxicated. And what I'm asking the Court to do is to set a clearer standard than what exists now in the case law that both sides have reviewed on what standard should apply, what level of intoxication should be enough for the police to realize they should not be obtaining a consent, they should instead be obtaining a warrant. The second issue is the apparent authority of the roommate to consent to the search of my client's private living space. And that turns more on the burden of proof, which I think we agree on what it is, but that I'm arguing that the judge didn't really apply the burden of proof correctly because there were too many facts in dispute which did not fall in favor of the government. Can I ask you about your first issue? I don't think you're arguing that there's a per se rule that if someone is intoxicated, they can't consent. You're not making that argument, right? I am not. And I'm also not saying that it does not involve the totality of the circumstances. So why do we need some kind of special new rule? It's one of the factors that you consider, obviously, the greater the level of intoxication, the more weight that factor might be given in determining whether or not someone can, whether it's voluntary or not. But why does there need to be some kind of special rule for that? Because in this case where intoxication is really the only issue related to consent, there's no allegation of coercion or being misled or being told that there was a search warrant already or something like that, where intoxication is the, really the sole issue. The level of intoxication, I think, is extremely significant. What I argued is... It's a question of driving under the influence where it's, you know, 0.8% or something. Blood tests don't have to be given as a general rule. Intoxication depends on the individual and how the individual can manage their consumption of alcohol and still be coherent. And it's an individual thing that has to be examined on each case, as far as I can tell. Oh, no, I agree. I agree with that. It's not a rule like the amount of alcohol, the blood, you know, that kind of thing? Right. I mean, again, this is a test that police have to apply. They're the ones who are obtaining the consent. What would your test be? My test would be, because police do have experience in observing people who are intoxicated, that if a person appears to be too drunk to drive, they should not be asked to wave away their constitutional rights in a consent form. We don't ask for that when a person takes a guilty plea. They give a blood test to people who are taken over, or a breath test, I guess it is, to determine whether they're intoxicated to the point where they're driving under the influence. It would be helpful if that were a requirement prior to obtaining consent from a drunk person. But it's not. I agree that it's not. But police certainly have experience in observing whether people appear to be sufficiently... They had a hearing, and the police also testified that they believed he was coherent enough to understand what he was doing. And we actually have body camera footage that the district court reviewed, and I reviewed, and the officer lays out the consent form, reads it to him. Mr. Fortune nods. He's listening. He spells out his name. He gives his date of birth. He gets the time all wrong. I mean, there are some problems. He got the military time confused. But everything else about that interaction, there was no slurring of speech. He didn't stagger to the refrigerator when he got the drink. It looked pretty non-eventful. I would agree in this case. In some ways, it was non-eventful. I think there was slurring of speech. Actually, I just want to point one thing out. After he went through the form with him and he was nodding and nodding, after he signed the form, he said, I just want to make sure you understand you're consenting to search the apartment. He had one last, like, clear as could be, and the guy says, okay. So... Right. I still argue that... How can we overturn the district court's finding that the officer's testimony of Estes' level of coherence in light of that body cam footage, there's nothing inconsistent with the body cam footage, right? Yes. Well, there is in the sense that earlier, not much earlier, one of those two officers is on the It's hard to get any information out of him. In addition to that, he himself kept saying he's drunk. The judge did have that information before the judge. That evidence was... Yeah, yeah. There's no question he had that. He had the body cam footage. Yeah. I understand that it could cut both ways. What I'm saying is that the standard for how drunk a person has to be is a little too subjective, and that the court should give guidance. If you were offering us something to say in an opinion, what would you say? What would the holding be? Well, number one is, I mean, for the court, if the person is too intoxicated to take a guilty plea, I mean, we wouldn't have let anybody you saw in that body cam or looking the way he did take a guilty plea in court. We don't use the standard for knowing a voluntary plea to apply to consent to search. But I think it does. It's the waiver of constitutional rights of equal magnitude, whether it's Sixth Amendment or Fourth Amendment. It's not the question of being coerced. It's the question of, do you understand, do you have these rights? A guilty plea proceeding is much more complicated than someone understanding that they have the right to decline to search the apartment, and they nevertheless let a guilty plea proceeding and going over a whole series of rights. You're going over a plea agreement. You're going over penalties. There's a lot going on in a guilty plea far beyond a consent to search, but it's just a totally different context. I take it your argument is that when one of the police describes him as very intoxicated, that that is probably a sign that the police should not be accepting his consent. Exactly. That is how I would put it. And again, in terms of setting some kind of standard. The analogy with a traffic stop doesn't work. Because usually a traffic stop has been done after somebody has done something foolish or reckless. But your analogy would be that allowing anybody to search your car or your apartment is foolish and reckless, so you really ought to administer some kind of a breathalyzer. No, it's not necessarily foolish or reckless, but it is the fact that a constitutional right is as important as it is, means that a person should have a clear understanding of what that right is and what he's giving up. And that's where I think in this case it's not clear that he had that clear understanding, and it's not clear what the police, I don't think it was clear to the police, what level of intoxication should have prevented them from proceeding in that way. Can I just ask you one question about the apparent authority issue? Yes. I think it all hinges upon whether or not your client objected, and the district court found that to be not credible, because if you put that aside, let's assume that that finding can't be challenged. Yes, I assume that. The fact was Mr. Fortune was the leaseholder, indicated he was the leaseholder, and I think it's undisputed that the bedroom, your client's bedroom door was unlocked, that he went in and out, that it wasn't locked. It could be locked. It wasn't locked. So what would indicia would indicate to the officers that Mr. Fortune could not consent to a search of the entire apartment if Mr. Boone is sitting there and didn't object as he consents to search the whole apartment? Well, I do disagree with some of that analysis of the facts. First of all, they showed their IDs, and both New York State IDs showed that they both were occupants of the apartment. He wasn't just a guest or something like that. Secondly, the police did have an opportunity to look in when my client went to get his ID and could see that he had all his own personal things in that room. The fact that he didn't object to a search of some other room is irrelevant. Is it just because there's multiple occupants? If someone is the leaseholder, they can consent to a search of the entire apartment unless there's some reason to believe that the particular other occupant is objecting or it's a locked room or there's some other indicia that it should be treated differently than the rest of the apartment. The simple fact that there's other occupants isn't enough. Well, I think the test in some of the case law that we discussed in our briefs that it's whether the occupants have or this consenting individual has the apparent authority to use or enter that room, and that was not the case. It's not clear there was a lock on the door or not. What is clear is that he closed the door right after the police asked him for his ID, which is some indication that he didn't want anybody going into his room. Well, this was going on. Your client didn't object. He didn't object until the safe was found. Well, that is a finding that I disagree with. It's sort of clear from the testimony that I think you can find on Appendix 65 and 85 that the only body cams that were on at the point where my client might have objected, where he said he objected, which is right after Fortune came out of the kitchen, went into the living room and sat down with my client, the only body cams were on the two officers who remained in the kitchen searching, making a lot of noise. So you couldn't hear any conversation from the living room. I'm talking about the body cams now. I'm talking about the testimony.  So Lanzer testified that he did hear my client make a complaint, but he wasn't the way he initially describes that. It sounds as if it's right after he signed the consent. Later he walks that back and says, well, it was a little later than that, maybe five to ten minutes after the consent was signed. The box was found at least five more minutes after the consent was signed by a different officer. What they did with that box during the next few minutes, we don't know. All I'm saying is it's completely ambiguous whether the objection that he clearly did make to having the apartment searched and to having Fortune sign a consent when he was intoxicated, that objection may or may not have been preceded, been simultaneous with, or been shortly after finding the box. And because the government has the burden of proof. But you made these arguments to the district court, I presume. Well, I wasn't the lawyer there. You made these arguments to the district court, and the district court had the same facts that you're presenting to us now and resolved ambiguities based upon testimony that he heard from everyone. Yeah, but I think the court can do a de novo review of that. I don't think the resolution of those. It's a credibility issue, isn't it? That's not credibility. I mean, some of it's credibility, but it's also just ambiguity. You just don't know. You don't know if there was a lock. You don't know. If a district court has a hearing, here's the testimony. The officer says there was no objection. And your client says that I did object. But it's not just my client. Once we were both admitted, there was an objection. The only issue was a win. No. The objection was to opening the safe. Nobody testified, no officer testified, that your client objected to a search of the apartment, of his room. The only thing that you're talking about is the fact that when I found the safe and he says repeatedly on the body cam footage, your client, that's personal, what's in there is personal, I don't want you opening that up. But there is no testimony that your client ever objected to the search of the apartment or to his room. Well, I'd have to look at it again to see. But I do think that in the cross of those officers, there was an objection. They agreed, at least one of them, that there was an objection to the fact that he signed that consent form while drunk, not to that he sought that. All right. If you could find that and you could present it during the rebuttal. Okay, thank you. All right. We'll hear from the government. Mr. Rosenberg. Thank you, Your Honors. May it please the Court. Joseph Rosenberg for the United States. I represented the government at trial and on this appeal. In this case, there was a suppression hearing, and at the suppression hearing, two NYPD officers and the defendant testified, and Judge Gardefee accepted into evidence numerous clips of body-worn camera footage from that night. On appeal, Mr. Boone is challenging two factual findings that Judge Gardefee made after that suppression hearing. The first is that Judge Gardefee found that the defendant's roommate was not too intoxicated to voluntarily consent to the search of his apartment, and the second was that the law enforcement officers reasonably concluded that the defendant's roommate appeared to have authority to consent to a search of the defendant's bedroom. Those findings rested heavily on credibility determinations that Judge Gardefee made, and at every turn, Judge Gardefee found the officers more credible than Mr. Boone. Because neither of those findings is clearly erroneous, this Court should affirm the judgment of conviction. Is there a published Second Circuit opinion that deals with the intoxication issue and says that intoxication does not automatically or per se vitiate a dissent? We've been unable to find one, Your Honor. There's a sentence case, which is a summary order, right? Yes, from 2016. There's also vega, which is a summary order from 2021, which is cited in our brief, and this Court has also affirmed in a published opinion, from 2004, this issue when a consentor was intoxicated, but didn't really deal with that issue. Didn't discuss it fully. Yeah, it was in a footnote, Your Honor. That's right. Why shouldn't we assume that when Mr. Fortune consented to the search of the apartment, that the police could see and understand that there was a room in that apartment that was not Mr. Fortune's space, that it belonged to somebody else? Your Honor, I'm not sure. I'm sorry. Let me restate the hypothetical. If Mr. Boone wasn't there, is it conceivable that the police could have searched Mr. Boone's room under the authority that was signed by Mr. Fortune? I think so, Your Honor. I think that what happened, the question that this Court should ask, that Judge Gardefee was compelled to ask, was whether it was objectively reasonable for the officers to conclude, based on the facts before them at the time, that Mr. Fortune appeared to have authority to consent to the search of the apartment, which included the bedrooms in the apartment. Judge Gardefee laid out a seven-part factual finding about that issue. But what if the police knew that of the two bedrooms, let's say there were actually three bedrooms, what if the police knew that each bedroom was occupied by somebody else and the other two weren't there, but Mr. Fortune signs a consent to search the apartment? You're saying that unless there's a lock on the bedroom door, that the police can search the spaces that they know are private to other people? No, Your Honor. I think I'm just talking about the facts of this case and that doesn't... Well, that sort of is the facts of this case because the police knew. The police knew that that was Mr. Boone's bedroom. Yes, Your Honor. Mr. Boone, maybe he can't afford his own apartment or his own mansion, but this was his space, this was his home. That's true, Your Honor. I think it's fair to say that the officers, the... Well, didn't the Supreme Court in Georgia v. Randolph, the Supreme Court said that you cannot search a co-tenant's room over that co-tenant's objection just because one co-tenant consents, right? The Supreme Court said that. Correct, Your Honor. But you don't have to affirmatively seek the consent of each occupant of the apartment. You can't search over the objection of an occupant, but you don't have to go through each person and hear actually the occupant was there and, again, the district court found even though the occupant was there and saw the search going on, Mr. Boone did not object when the leaseholder consented, right? That's, of course, right, Your Honor. And there are cases in which courts permit law enforcement officers, when it's objectively reasonable for them to have done so, to search a bedroom of a co-tenant based on another co-tenant's consent. At what point did Boone raise the objection? Was it only after the box, the safe was found, or was it before that? Any objection to the consent itself? After the fact or before the fact? Anything of that sort? Judge Gardefy found very clearly that Mr. Boone objected only after the safe was found, and he realized that the discovery of the handgun in the safe would put him in jeopardy. Mr. Nutter suggested that one of the officers acknowledged that Mr. Boone objected to Mr. Fortune signing the search because he was drunk. Did the officers – is that something the officers testified to, that Mr. Boone objected? Your Honor, I think so. I think we discussed this in page 40 to 41 of our brief a little bit. But the officers testified pretty clearly in the government's view that they didn't hear Mr. Boone make an objection until after the safe was found. But at one point, Officer Wanzer, I think on cross-examination, hedged a little bit and said, I'm actually not quite sure I remember when Mr. Boone was objecting to Mr. Fortune's being too drunk to have signed the consent-to-search form. All of that information, of course, was in front of Judge Gardefy. It's a finding that this Court reviews for clear error. Judge Jacobs pointed out that – and it's on the body camera footage that the officer, calling back to his supervisor, did say, he's completely intox. We're having a hard time getting any information out of him. So could that be possibly a basis for finding that there's clear error that he was able to consent when the officer himself made that observation? I don't – that happened, Your Honor. Judge Gardefy was fully aware of it. It was a main part of the arguments below. I don't think it's a basis for finding clear error when the standard is a totality of the circumstances. Judge Gardefy didn't have to rely on testimony, although, of course, he did. He saw Mr. Fortune and how Mr. Fortune acted that night on the substantial amount of body-worn camera that was admitted at the hearing. And that fact alone, taken out of context, even alone can't support the weight that Mr. Nutter assigned. I was a little surprised. Is it practice for the police officer to turn the body camera on and off? As Mr. Nutter noted, there's a significant portion that's just not on the body camera. Why is that? Wasn't a malfunction of the body camera? The police officer's turning it on and off during the course of an interaction like that? Yes, Your Honor. So there was testimony about this below as well. Both officers testified that they used their body-worn camera as they normally do that night. What they do in general, they explained to Judge Gardefy, was they activate their body-worn camera when they're – during their initial investigation, when they're called to a scene, for example, and then they deactivate it because it's – one reason being that it's battery-powered. They deactivate it when their initial investigation ceases. So is it just when they're interacting with the suspects or the defendants that they turn the body camera on? I can't say that that's the case, Your Honor. In this case, that's actually not what happened. They turned them on when they arrived at 1428 Webster. The body-worn camera – If they're having a conversation with a suspect while they're doing the search, suppose they – one of the officers wants to talk to one of the suspects. Would that activate – would they then proceed to activate the camera? Was there testimony to that score? Your Honor, there wasn't really. I think just a couple things. The first is that I wouldn't – I know that Mr. Nooter noted this, but it's not a ground, really, for Mr. Boone's not complaining on it about it on appeal. Right. But in any event, what happened in this case, the testimony established that it wasn't on for all of their interactions with Mr. Fortune and Mr. Boone for the reasons that they testified about. And I don't know much further about how they use it or don't other than what's in the record. What about the time issue when presumably Fortune gets a little confused about the time? I think that – I don't know. I didn't really see a strong argument by the other side that that was evidence of disability on the basis of intoxication. But what was going on there from your perspective? Well, Judge Gardefee addressed that. That was before Judge Gardefee. He said in his opinion that it wasn't that surprising that Mr. Fortune was confused because a lot of people are confused about military time in general. Judge Bianco said that he watched some of that portion of the body-worn camera. I'm not sure if Your Honor has, but I think that – No, I did. I did. And I think my view of the evidence there is that Mr. Fortune appears completely coherent and he got confused by something that reasonably, you know, could make someone confused. Well, it wasn't stated that it was military time in the body cam, but that's the information for it, I guess. I wasn't sure what it was, 0147. What did that mean? When I saw it, I was perfectly sober. Well, I think that's further to the point, Your Honor. Is it the government's position that the defendant gave implied consent to the search of his room or that his consent was not required once his roommate authorized the search of the apartment? Well, I think, Your Honor, that the Supreme Court has been clear, as Judge Bianco already articulated in Georgia v. Randolph, that the government – law enforcement doesn't have an affirmative obligation to seek out consent from multiple co-tenants if it has received consent lawfully from one co-tenant to search an area, a jointly occupied premises. I think that's just the law. Well, that certainly wouldn't apply if you had a two-family house, would it? I'm not sure, Your Honor. Well, I am. If you have a two-family house and one family is living upstairs and another living downstairs, I don't – I think it would be suspect at least if the downstairs tenant said, well, you can go upstairs, that those folks live up there. I'm sure they wouldn't mind. That makes sense to me, Your Honor, but that's not what happened. So is it implied consent because he's there or is there no – your position is no consent is required? In this – in this case, Your Honor, Mr. Fortune's consent was enough. That's right, Your Honor. Well, it was enough to create apparent consent. Correct, Your Honor. Judge Hardiff, he found that it wasn't – he didn't find actual – necessarily find actual consent. Correct. He could have had apparent consent. That's right, Your Honor. And he was the leaseholder, right? Not just – it was not just like multiple people living in the same place. He identified himself as the leaseholder of the apartment, right? That's right, Your Honor. The law enforcement officers understood he was the leaseholder, that Mr. Boone was not on the lease, and the other facts that Judge Gardefee outlined in his seven-part factual finding led to the conclusion that the apparent authority was reasonable. If there are any further questions, I'm happy to answer them otherwise. You're 0-2, 2-5 over, so. Thank you, Your Honor. All right. Mr. Nutter, you have two minutes in rebuttal. Thank you. Yes, Judge Gardefee did find that there was no actual consent, simply from the circumstances of the case. It was the issue of whether the police were entitled to rely on apparent consent by Mr. Boone. With respect to the body cam points, there were a dozen or more body cams, but they were turned on and off by different officers at different times. And the key moment when it would have been good to have one was when Mr. Fortune returned from the kitchen to the living room where Mr. Boone was. There were officers there, but none of them seemed to have had their cameras on. I mean, I checked the chart. None of them had their cameras on. The only ones that were on were in the kitchen, and the kitchen is a little farther than it sounds from the living room. But does that have anything? Does that bear on anything other than the credibility of the police officers, which Judge Gardefee found was sound? What it does is it doesn't corroborate when the complaints were made. We asked where the complaints were made. If I can refer to a number of the pages of the appendix, at A63, Wandsor, Police Officer Wandsor on cross, questioned, and when he, meaning Fortune, was done signing the form, he took, he picked up the copy, folded it up, and took it with him to the living room, right? Yes. And isn't it true that after that happened, after Mr. Fortune went into the living room with that blank consent form, you could hear Mr. Boone complaining about the fact that Mr. Fortune signed the consent form, consent to search form, right? Yes. You could hear Mr. Boone complaining that Mr. Fortune was too drunk to sign a consent to search form, right? Yes. And that you also heard Mr. Boone complaining that Mr. Fortune didn't even know what he was signing, right? Yes. So that, just from the sound of that, it sounds as if it was pretty immediate. Wandsor walks that back a little bit, though, and says that, let me just. Well, even if you assume he didn't walk it back, Mr. Mewder, that doesn't, they don't have to listen to what your client thinks about the level of intoxication of Mr. Fortune, right? No, no. But it's a complaint. He's making a complaint that the consent form isn't valid, and therefore the search by consent isn't valid because the guy who signed the consent form is too drunk. And it applies to his living area as well as the rest of the apartment. What is that control? I mean, the judge made a finding that was different from that. Because I'm arguing the finding is wrong. In other words. Based upon your client's own opinion as to the level of intoxication, which obviously the district court doesn't have to accept. If your client said he's too drunk to consent, and this is my space too, and I object, that would be a different argument. My point isn't that, of the truth of that. My point is the fact that it's a complaint. When there is apparent consent and somebody complains that they don't want their private space, in this case the whole apartment, but they don't want their private space searched. He didn't say that. It doesn't matter whether the reasons are truthful or correct. You've implied that, that that's what he intended. But he didn't. Those weren't his words. I don't think he was confident to sign the consent form because he was too drunk. But that's different from saying, wait a minute, that's my space. You can't search it. I object. Go get a warrant. Whatever. That occurred. The officers went into that space, and your client seemed to accept it until they found the safety box. Well, again, at pages 869, it talks about Wanzer hearing this complaint five to ten minutes after they started doing the search in the kitchen. He would have heard it coming out of the living room. The body cam didn't pick it up, but he says he heard it. Mora at page 85 says, do you remember Boone complaining that Fortune was too drunk to sign the consent? Yes. Mr. Boone said Mr. Fortune had been forced to sign the form. Yes. And that he couldn't understand what he was signing, right? Yes. And that he should have refused to sign the form. All of that goes to whether the form gives the police a justification for searching the apartment. So he's objecting to the search of the apartment by raising those complaints about having Mr. Fortune sign the form when he's drunk, which notably they did in a separate room from Mr. Boone, who was not drunk. They clearly picked him out and away from the person who had the mental capacity to object, to understand what the rights are and to object. We understand the argument. Thank you for your arguments today. Thank you to the government. We'll reserve the decision. Have a good day. Appreciate it. Thank you very much.